# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

TIMOTHY DIAZ,

       *Plaintiff,*

  v.

POLICE OFFICER BULLOCK, et al,

       *Defendants.*

Civil Action No. 13-5192

**OPINION**

---

**John Michael Vazquez, U.S.D.J.**

    This matter concerns the arrest of the wrong person, Plaintiff, by New Jersey police officers in response to an outstanding Maryland warrant. This Opinion addresses motions for summary judgment filed by (1) South Plainfield Police Officer Mark Bullock and Lieutenant Peter Arancio (the "Officer Defendants") (D.E. 88); (2) the Borough of South Plainfield and the South Plainfield Police Department (the "South Plainfield Defendants") (D.E. 89); and (3) the County of Middlesex and Middlesex County Office of Adult Corrections and Youth Services (the "Middlesex Defendants") (D.E. 91). Plaintiff Timothy Diaz opposed the motions (D.E. 93, 96, 101), and Defendants filed briefs in reply (D.E. 97, 98, 102). The Court reviewed the submissions made in support and opposition to the motions, and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Defendants' motions are **GRANTED** as to Plaintiff's Section 1983 claims. As a result, however, the Court no longer has subject matter jurisdiction over this matter. Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and this case is **REMANDED** to the Superior Court of New Jersey.

# I.   FACTS AND PROCEDURAL HISTORY

### 1.  Factual History

Plaintiff Timothy Jarah Elijah Diaz, an African American male, was born in December 1988. At the time of the underlying incident, Plaintiff was approximately 5 feet 11 inches tall; weighed 250 pounds; and lived in Plainfield, New Jersey. Plaintiff's Statement of Material Facts ¶¶ 1-3; *see also* Certification of Renee Biribin ("Biribin Cert.") Ex. D. Plaintiff was mistakenly arrested pursuant to an outstanding warrant for Timothy Joshua Diaz, which was issued in Prince George's County, Maryland. Plaintiff was arrested after a National Crime Information Center ("NCIC") report alerted the New Jersey officials as to the Maryland warrant. The wanted "Timothy Diaz" was a Hispanic male who was born in 1993. The NCIC report, which was generated by Prince George's County employees, indicated that the wanted Timothy Diaz was approximately 5 feet 11 inches tall, weighed 140 pounds, was born in 1993, and lived in Maryland. *Id.* Ex. E. The Prince George's County employees, who have since been dismissed from this matter on jurisdictional grounds, acknowledged that they incorrectly entered Plaintiff's driver license number, FBI number, and social security number into the NCIC report instead of the correct information for the wanted Timothy Diaz. Certification of John Gillick ("Gillick Cert.") Ex I, T17:18-18:3; Ex. K, T27:21-32:7.

On Saturday, July 14, 2013, South Plainfield Police Officer Mark Bullock saw a car pull into the parking lot, without signaling, of a Ramada Inn. Deposition Transcript of Mark Bullock ("Bullock Dep.") T9:16-10:15; T14:4-12. The hotel was an area known for criminal activity. *Id.* As a result, Bullock "ran the plate" of the car. As Bullock was running the plate, three men got out of the vehicle and entered the hotel. *Id.* 14:6-24. After the men entered the hotel, Bullock noticed that there was a "hit" for Plaintiff, the registered owner of the vehicle, as indicated by an

NCIC report. The NCIC report showed an active arrest warrant for Plaintiff from Prince George's County. *See* Biribin Cert. Ex. E. Bullock called dispatch to confirm that he actually had a match and also notified his Lieutenant, Defendant Peter Arancio. Bullock Dep. T15:4-13. Dispatch informed Bullock that Plaintiff appeared to match the description of the wanted individual and that dispatch was attempting to contact the Prince George's County Sheriff's Department for additional corroboration. *Id.* T31:20-23.

Bullock remained in his patrol car while waiting for confirmation. During this time, Arancio and one other South Plainfield police officer arrived. *Id.* T32:1-17. Eventually, Bullock received the necessary confirmation from dispatch, including verification that Prince George's County would extradite the wanted Timothy Diaz if arrested. *Id.* T33:16-2.

Bullock, Arancio, and the other police officer then went to Plaintiff's room in the Ramada Inn. When they arrived, one of the officers asked Plaintiff if he was Timothy J. Diaz, to which he answered "yes." The officers informed Plaintiff that there was a warrant for his arrest and asked if he had ever been to Maryland. Plaintiff told the officers he had received a speeding ticket on I-95 in Maryland, but that he had never been to Prince George's County. Deposition of Timothy Diaz ("Diaz Dep.") at T11:14-24. Based on this information, Plaintiff was arrested at the Ramada Inn and brought to the South Plainfield Police Station for booking. Bullock, however, noticed the weight discrepancy between Plaintiff and the wanted Timothy Diaz before leaving the motel. Bullock Dep. T40:4-14.

Once at the police station, Plaintiff learned through the booking process that the wanted Timothy Diaz had a different address, middle name, and birthdate. Plaintiff tried explaining that he was arrested by mistake and offered to show his birth certificate and social security card, which Plaintiff carried at all times. Diaz Dep. T22:21-9; PSOMF ¶ 6. According to Plaintiff, the officers

refused to look at either document. Arancio, however, does not believe that Plaintiff ever offered to show his birth certificate and does not recall discussing the birthdate difference with Plaintiff. Deposition Transcript of Timothy Arancio ("Arancio Dep.") T21:11-22:2. Both Bullock and Arancia, however, were aware of the birthdate discrepancy during the booking process. Bullock Dep. T35:11-15; Arancia Dep. T20:19-23. Despite knowledge of these differences, Plaintiff was not fingerprinted and neither officer asked the Prince George's County Sheriff's Department for a picture or other information to confirm that they had arrested the correct person.

Later that evening, Plaintiff was processed and admitted to the Middlesex County Adult Correction Center in North Brunswick, New Jersey. Plaintiff was detained pursuant to a local fugitive from justice warrant that was drafted by the South Plainfield Police Department and a temporary commitment order signed by a municipal court judge. Certification of Patrick J. Bradshaw ("Bradshaw Cert.") Exs. L, M. The record is not clear when Plaintiff first appeared before a judge or when he first spoke with an attorney. Based on Plaintiff's deposition testimony, however, it appears that Plaintiff appeared before a judge on Sunday, the day after his arrest, and retained an attorney by Monday. Diaz Dep. T60:2-24. Plaintiff alleges that while he was detained at the Correctional Center, the Middlesex Defendants ignored his claim of mistaken identity. *See, e.g.*, *id.* T61:6-17.

During a bail hearing on July 24, 2012, the Middlesex County Prosecutor's Office contacted the Prince George's County authorities to confirm that Plaintiff was the wanted Timothy Diaz. After about an hour of research, Prince George's County learned that the wanted Timothy Diaz had been arrested by Maryland authorities on July 16, 2012. Biribin Cert. Ex. H, T31:13-33:15. Plaintiff was released that day, once the Middlesex County Department of Corrections received a court order for Plaintiff's release. Certification of Robert Grover, Jr. ¶ 5; Bradshaw

Cert. Ex. O.

## 2. Procedural History

Plaintiff brought suit on June 12, 2013, in New Jersey state court against Defendants alleging various tort claims and a claim under 42 U.S.C. § 1983. Defendants removed the matter to this Court on August 29, 2013. D.E. 1. Plaintiff filed an Amended Complaint on June 19, 2014, that included additional defendants who were affiliated with the Prince George's County Sheriff's Department. D.E. 32. These additional parties, however, were dismissed from the case due to lack of personal jurisdiction. D.E. 55. After the close of discovery, Defendants filed the current motions for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## III.   ANALYSIS

### 1. Section 1983 Claims

Section 1983 is not a source of substantive rights, instead it provides a vehicle for vindicating the violation of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

proceeding for redress[.]

42 U.S.C. § 1983. Thus, to establish a Section 1983 claim, a plaintiff must demonstrate that (1) there was a violation of a right under the Constitution and (2) the violation was caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).[1]

### a.    The Officer Defendants' Motion for Summary Judgment

The Officer Defendants contend that they are entitled to qualified immunity for the Section 1983 claim. Qualified immunity "shields government agents from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Thomas v. Independence Township*, 463 F.3d 285, 291 (3d Cir. 2006) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)). In determining whether qualified immunity exists, a court must assess whether (1) the facts alleged by plaintiff show the violation of a constitutional right; and (2) the plaintiff's constitutional right was clearly established at the time of the violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan,* 555 U.S. 223 (2009). *See also Egolf v. Witmer*, 526 F.3d 104, 109-11 (3d Cir. 2008) (reviewing the two-step inquiry that generally occurs in a qualified immunity analysis).

Plaintiff's Section 1983 claim as to the Officer Defendants appears to be based on false arrest and false imprisonment. Am. Compl. ¶¶ 46-47. The Fourth Amendment protects against unreasonable seizures of the person. *See* U.S. Const. amend. IV. The Fourth Amendment, in turn, is applicable to the States through the Fourteenth Amendment. *Baker v. McCollan*, 443 U.S. 137,

---

[1] Here, Defendants do not dispute that they acted under color of state law. Thus, as to Plaintiff's *prima facie* case, the analysis turns on whether there was a violation of Plaintiff's constitutional rights. However, there are additional, pertinent issues that the Court must also resolve, such as qualified immunity and whether certain Defendants had a policy, practice, or custom that would expose them to liability.

142 (1979). The proper inquiry in a Section 1983 claim based on false arrest is whether the arresting officer had probable cause to make the arrest. *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). In addition, a false imprisonment claim is based on "the Fourteenth Amendment protection against deprivations of liberty without due process of law." *Id.* at 636. A false imprisonment claim that "is based on an arrest without probable cause is grounded in the Fourth Amendment's guarantee against unreasonable seizures." *Id.* at 636. An unlawful detention outside this context may still give rise to a false imprisonment claim but such a claim is premised solely on the Fourteenth Amendment. *Potts v. City of Philadelphia*, 224 F. Supp. 2d 919, 937 (E.D. Pa. 2002). As is discussed below, the Court concludes that after a person is initially arrested pursuant to probable cause, it is the Due Process Clause of the Fourteenth Amendment, rather than the Fourth Amendment, that provides the appropriate avenue for redress whether the person is asserting a claim for false arrest or false imprisonment.

"[A]n arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability for false arrest." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000). At the same time, "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill v. California*, 401 U.S. 797, 802 (1971). Thus, in assessing whether probable cause existed in the case of a mistaken-identity arrest, a court must consider (1) whether there was probable cause to arrest the true target, and (2) whether the mistake was reasonable. *Id.*

For the reasons that follow, the Court determines that the Officer Defendants are entitled to qualified immunity. This finding does not relieve the Officer Defendants from potential tort liability. The basis for the Court's finding as to qualified immunity is that to the extent there is a

constitutional right at issue, it is not clearly established. There is no Third Circuit precedent, cited by the parties or found by the Court, which clearly establishes the right. The leading Supreme Court case merely indicates that such a right might exist. Moreover, no persuasive authority from other jurisdictions conclusively establishes that such a right is clearly established. In fact, courts addressing the issue have taken divergent views. In doing so, courts appear to focus on, among other things, an officer's investigation establishing probable cause sufficient for an arrest as opposed to the dissipation of probable cause following a lawful arrest. Case law also appears to distinguish between officers who merely effectuate an arrest pursuant to a valid warrant and those who are involved in the underlying investigation, sometimes referred to as the "prosecuting" officers.

It is important to reiterate that arresting the wrong person does not automatically result in a constitutional violation. Instead, such an arrest still complies with the Fourth Amendment if it is reasonable. As noted, if police officers mistakenly arrest the wrong person, the arrest is nevertheless constitutional if there is probable cause to arrest the correct person and the officers reasonably believe that they have arrested the right person. *United States v. Marshall*, 79 F.3d 68, 69 (7th Cir. 1996) (citing *Hill v. California*, 401 U.S. 797, 802 (1971)).

In *Baker v. McCollan*, 443 U.S. 137, 141 (1979), Linnie McCollan's brother, Leonard, got a duplicate copy of Linnie's driver's license, which contained Linnie's identifying information except for the picture. Leonard was subsequently arrested in Potter County, Texas, but gave Linnie's name and identifying information. *Id.* at 141. An arrest warrant was thereafter issued for Linnie (but in reality meant for Leonard), and Linnie was arrested pursuant to the warrant later that year in Dallas. *Id.* Linnie informed the officers that they had the wrong man, but it was not until Linnie was transferred to the jail in Potter County that he was released (eight days after being

arrested) when officials compared a photograph of Leonard (posing as Linnie) with Linnie. *Id.*

Linnie then sued, asserting a Section 1983 claim for false imprisonment.

The Supreme Court indicated that the threshold question was whether Linnie's detention was unconstitutional, while at the same time acknowledging that it may have been wrongful pursuant tort law. *Id.* at 142. The *Baker* Court further assumed that Linnie relied on the Fourteenth Amendment's Due Process Clause, which incorporated Fourth Amendment protections to state defendants. *Id.* at 142-43. The Fourth Amendment, in turn, required "States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Id.* at 143 (citation omitted). The Court in *Baker* further noted that the probable cause standard for detention is the same as that for arrest; defendants are not entitled to separate probable cause determinations for both arrest and detention. *Id.*

The Supreme Court then concluded that Linnie's case did not raise a claim under the Constitution because, although he was deprived of his liberty for a number of days, the detention was pursuant to a warrant that met the Fourth Amendment's requirements. *Id.* at 144. The Court further noted that after his valid arrest and detention, Linnie had other constitutional protections to secure his release, such as his right to a speedy trial. *Id.* The *Baker* Court also assumed for the sake of argument that "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law[,]'" but concluded that Linnie's situation had not amounted to such a deprivation. *Id.* at 145.

In support of its holding, the Supreme Court made the following observation:

> Given the requirements that arrest be made only on probable cause
> and that one detained be accorded a speedy trial, we do not think a
> sheriff executing an arrest warrant is required by the Constitution to
> investigate independently every claim of innocence, whether the

> claim is based on mistaken identity or a defense such as lack of requisite intent.

*Id.* at 145-46. In closing, the Court in *Baker* again reiterated that "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Id.* at 146.

In *Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000), the Third Circuit had the opportunity to address the constitutionality of continued detention in the face of exculpatory evidence, but ultimately determined that the facts presented did not require a determination of the applicable constitutional contours. In *Wilson*, the plaintiff filed a Section 1983 claim for false arrest and imprisonment. The suit stemmed from a robbery of florist shop. Two employees from the shop indicated that the assailant was between 6'2" and 6'5", while Plaintiff was either 5'10" or 5'11"; one of the employees also picked Plaintiff out of photographic array while the other indicated that he could not be sure that the robber's picture was among the photographs. *Id.* at 783-85. In addition, an employee from a nearby business informed police that Plaintiff was in the area around time of the robbery, but 30 minutes after the actual robber had first entered the florist's store. *Id.* at 784. The police secured an arrest warrant but also omitted several pertinent facts and made a misstatement as to how the photographic array was compiled. *Id.* at 785. The plaintiff was thereafter incarcerated for a month, but the grand jury did not indict him. *Id.*

The first issue addressed by the court in *Wilson* concerned the officer's omissions and misstatement in securing the arrest warrant. *Id.* at 786-92. The Third Circuit concluded that while the officer omitted information that should have been presented to the judge issuing the arrest warrant, there was nevertheless sufficient probable cause to sustain the plaintiff's arrest. *Id.* at 791-93.

Turning to the issue of continued incarceration, the plaintiff argued that he was improperly

kept in jail after the police learned of exculpatory facts following the arrest. *Id.* at 792. Specifically, the plaintiff pointed to an alibi witness, a friend of the plaintiff's, who said that he was with the plaintiff during the time of the robbery. *Id.* The Third Circuit first observed that "[t]he law in this area is not entirely settled." *Id.* at 793 (citing *Brady v. Dill*, 187 F.3d 104, 112 (1st Cir. 1999) & *id.* at 117-25 (Pollak, J., concurring); *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992); *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986)). As to the cited cases, the *Wilson* court noted that certain circuits had found that police officers have no duty to release individuals when the officers learn of exculpatory information after the initial arrest while others had determined that that a continuation of an otherwise lawful arrest is unconstitutional when the police discover additional information which erodes the original probable cause. *Id.*

Ultimately, the Third Circuit concluded that "[w]e do not, today, need to decide these difficult issues." *Wilson*, 212 F.3d at 792. The *Wilson* court determined that regardless of the scope of law enforcement's duty to act on exculpatory information following a valid arrest, the plaintiff's information "did not dispel the earlier probable cause." *Id.* Among other things, the court pointed to the fact that the stated alibi nevertheless put the plaintiff in the vicinity of the crime when it occurred. *Id.* at 793.[2]

As noted, courts have drawn a distinction between a failure to conduct an adequate investigation to establish probable cause in the first instance as opposed to an arrest pursuant to a valid warrant in which the officer later learns of exculpatory information that impacts the original probable cause finding. In *Clipper v. Takoma Park*, 876 F.2d 17 (4th Cir. 1989), the Fourth Circuit

---

[2] The Court also notes that the alibi witness in *Wilson* was an admitted friend of the plaintiff; a relationship that other courts have considered in determining the strength of an alibi. *See, e.g.*, *Kelly v. Jones*, 148 F. Supp. 3d 395, 403 (E.D. Pa. 2015) ("[This] is not a case where the validity of the alibi depended upon the veracity of witnesses who might have an incentive to lie[.]").

upheld a jury verdict finding a false arrest in violation of Section 1983. Although the officers in *Clipper* had obtained an arrest warrant for the plaintiff in a bank robbery, the court found that ample evidence supported the jury's finding as to the lack of probable cause because the officers failed to follow-up with alibi witnesses, failed to review available fingerprint evidence, and failed to obtain and review surveillance videos which demonstrated that the plaintiff was not the culprit. *Id.* at 19-20.

Similarly, the Seventh Circuit in *BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986), affirmed a verdict finding that a police officer had falsely arrested and imprisoned the plaintiffs in violation of Section 1983. In *BeVier*, the officer arrested the plaintiff parents for child neglect upon seeing their minor children, with unsanitary conditions nearby, in the sun and somewhat listless. *Id.* at 125. The court in *BeVier* determined that the officer's mistaken determination of probable cause was unreasonable because the officer failed to interview the children's babysitter or the parents (who were not present when the officer came upon the children). *Id.* at 127. If the officer had interviewed the parents, he would have learned that they had instructed the babysitter to keep the children out of the sun, had bathed the children daily, and had been properly treating one child's diaper rash. *Id.* If the officer had taken these additional steps, he would have learned that he did not have probable cause to establish the necessary *mens rea*, that is, the parents intentionally or willfully neglected their children.

In *BeVier*, the Seventh Circuit also noted that after the arrest, the officer failed to heed the advice of an experienced child abuse investigator, who indicated that there did not appear be a child neglect violation. *Id.* at 128. To this end, the court stated that "[t]he continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause." *Id.* (citation omitted). Yet, the *BeVier* court also noted that there is

"no general duty to investigate further after acquiring information sufficient to establish probable cause." *Id.* at 127 n.1 (citing *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 437-42 (7th Cir. 1986)). Thus, post-arrest, it appears that the Seventh Circuit will find a constitutional violation if an officer becomes aware of information that ameliorates an earlier probable cause determination but, at the same time, the officer is under no obligation to actively look for such exculpatory information.

Also, as noted, certain courts have made a distinction between the duty of an officer who merely affects an arrest and one who is actively involved in the investigation or in obtaining the warrant. *See, e.g., Brady v. Dill*, 187 F.3d 104, 112 n.8 (1st Cir. 1999). This distinction was critical in *Kelly v. Jones*, 148 F. Supp. 3d 395 (E.D. Pa. 2015), in which a motion to dismiss was filed. In that case, the plaintiff was arrested in 2012 pursuant to a 2006 warrant. *Id.* at 399. Only the wanted person's name appeared on the arrest warrant. *Id.* The name on the warrant matched the plaintiff's name, but the plaintiff made it clear that he was not the right person because he had been incarcerated at the time of the earlier offense. *Id.* The plaintiff was jailed for over a month before being released. *Id.* He then sued, alleging a violation of Section 1983,[3] among other things. *Id.*

The court in *Kelly* first found that the arresting officers were entitled to dismissal. *Id.* at 402. The judge reasoned that the constitutional standard for a valid arrest warrant only requires the name of the defendant and that the arrest warrant contained the plaintiff's name, even though the warrant actually pertained to a different person with the same name. *Id.* at 401.

But the *Kelly* court reached a different conclusion as to the officer who brought the original

---

[3] The Section 1983 violation was one of malicious prosecution because the plaintiff's false arrest and imprisonment claims were admittedly time barred. *Id.* at 400. However, an element of malicious prosecution required the underlying proceeding to be "initiated without probable cause." *Id.* Lack of probable cause is also an element of false arrest and imprisonment, the claims at issue here.

charges leading to the warrant, who the court referred to as the "prosecuting officer[.]" *Id.* at 402-04. The court noted that the prosecuting officer decides whether a suspect "continues to be *held*" after first being taken into custody. *Id.* at 402 (emphasis in original). The judge noted that the plaintiff was in custody in the same jurisdiction from which the arrest warrant emanated, so a mug shot comparison was no burden on the officer. *Id.* The court in *Kelly* viewed the issue as how far to extend the protection announced in *Baker*. *Id.* The judge further noted that the only matching information on the warrant was the plaintiff's name, which was also not an unusual name, so that there was greater room for error. *Id.* at 403. As to exculpatory evidence, the *Kelly* court distinguished between "fundamental" evidence, "which an officer must consider, and evidence that could be subject to a variety of interpretations." *Id.* (citing *Romero v. Fay*, 45 F.3d 1472, 1477 (10th Cir 1995)). The court observed that the prosecuting officer had access to "objectively verifiable information from official sources that [the officer] could have consulted with minimal effort: a mug shot of the suspect and criminal records that would have definitively established that the wrong person had been arrested." *Id.* at 403. As a result, the court denied the motion to dismiss as to the prosecuting officer. *Id.* at 400. The court in *Kelly* also declined to find that the prosecuting officer had qualified immunity in light of the plaintiff's allegations. *Id.*

The First Circuit addressed the issue of continued detention of the wrong person following a valid arrest in *Brady v. Dill*, 187 F.3d 104 (1st Cir. 1999). In *Brady*, a suspect was stopped for driving while intoxicated, and he gave the plaintiff's identifying information to law enforcement. *Id.* at 106. Thereafter, a warrant was issued for the suspect and plaintiff was arrested by state troopers in a different jurisdiction. *Id.* Plaintiff immediately stated his innocence, and the troopers began investigating. *Id.* at 106-07. The troopers got the underlying police reports and noted some minor discrepancies concerning the actual suspect's description and then the troopers contacted

the officer who issued the drunk driving citation. This furthered the troopers' suspicions that the plaintiff may have been the wrong person. *Id* at 107. The troopers then asked the plaintiff who may have obtained his identification information, arranged to have the plaintiff released on bail (which the plaintiff declined, fearing his signature on the release papers may constitute an admission of guilt), and attempted to get an attorney for the plaintiff. *Id.* Since the plaintiff was arrested on a Saturday, the troopers took him to the first available court session on Monday, and the plaintiff was released. *Id.* In total, the plaintiff spent a day and a half in custody. *Id.* The plaintiff then sued for false arrest and imprisonment pursuant Section 1983.

In reviewing qualified immunity under Section 1983, the *Brady* court stated that the threshold issue is whether "the Constitution recognizes the right asserted by the plaintiff." *Id.* (citing *Conn v. Gabbert*, 526 U.S. 286 (1999)). In light of the Supreme Court's ruling in *Baker*, the First Circuit concluded that once police arrest a suspect pursuant to a valid "matched"[4] warrant, the suspect does not have a Fourth Amendment right to be released by law enforcement if the police later conclude, unilaterally, that the person is innocent. *Id.* at 108. (citing *Baker*, 443 U.S. at 143-44). The plaintiff, the court continued, was arrested pursuant to a valid warrant. *Id.* The First Circuit opined that with the possible exception of excessive force, the Fourth Amendment no longer provides the appropriate constitutional recourse for a suspect once the person has been arrested pursuant to a valid warrant. *Id.* at 110 (citations omitted). After a valid arrest, the court explained, the Due Process Clause was the appropriate avenue for a detainee seeking redress. *Id.*

The court in *Brady* determined that once detained, a person asserting mistaken identity is "in effect pressing a claim of innocence in fact – a claim not analytically distinct from any other

---

[4] The First Circuit defined a "matched" warrant as one in which the arrested person's "identity matches the stated identity of the person denominated in the warrant[.]" *Brady*, 187 F.3d at 108.

factual defense" such as alibi or lack of specific intent. *Id.* at 111-12. The court found that at that stage, "the prosecutor, the judge, and the jury are institutionally better equipped to make such determinations[,]" such as mistaken identity. *Id.* at 112. The First Circuit decided that a police officer has a fundamentally different role in our justice system: the officer's role is to lawfully execute a valid, judicially-ordered warrant. *Id.* The court explained that "[t]o place on police officers the additional burden of determining, after a legitimate arrest pursuant to a facially valid warrant, whether the person detained is or is not the guilty party would blur the usual separation of functions." *Id.* If it were to adopt the plaintiff's position, the First Circuit feared that it would potentially turn "police stations into tribunals for making preliminary determinations of guilt or innocence – an eventuality that *Baker* explicitly disavows." *Id.* at 114. The court in *Brady* indicated that instead of police making determinations as to guilt or innocence, "a prompt hearing before a magistrate" should normally be the appropriate vehicle to decide whether the right person has been arrested pursuant to a valid warrant. *Id.*

The *Brady* court cautioned, however, that police still retain the duty to inform the prosecutor or judge of "known exculpatory information." *Id.* at 114 (citation omitted). The court, moreover, indicated that while making a prosecutor or judge aware of such information would be "ordinarily sufficient" for an officer to discharge his duty, such action may nevertheless fall short in "extreme circumstances[.]" *Id.* at 115. Recognizing that *Baker* did not foreclose the possibility of a constitutional violation, the First Circuit noted that

> [d]epending upon factors such as the length of the detention, the behavior of the police, the source and quality of the information available to them, and the nature of the pretrial procedures afforded by local law, there may be circumstances so egregious as to ground a substantive due process claim.

*Id.* (citing *Gray v. Cuyahoga Cty. Sheriff's Dep't.*, 150 F.3d 579, 582-84 (6th Cir. 1998); *Rodriguez*

*v. Roth*, 516 F. Supp. 410, 412 (E.D. Pa. 1981)). Turning to the case before it, the *Brady* court concluded that the plaintiff's arrest pursuant to a valid "matched" warrant was lawful pursuant to the Fourth Amendment. *Id.* The court similarly found that the plaintiff's circumstances fell within the due process strictures of *Baker* so that there was no constitutional violation. *Id.*

The court in *Brady* noted that even if it had found a constitutional violation, the officers would nevertheless be entitled to qualified immunity. *Id.* To be a clearly established right, the court stated that "the law must have defined the right in quite a specific manner, and that the announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent *ex ante* to reasonable public officials." *Id.* at 116. Relying on the Supreme Court's decision in *Wilson v. Layne*, 119 S. Ct. 1692 (1999), the First Circuit noted that a right could be clearly established either through cases of controlling authority in the jurisdiction where the action took place or through a "'consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *Id.* at 116 (quoting *Wilson*, 119 S. Ct. at 1700). Finding that there were no precedential opinions within the circuit and that there was no consensus of persuasive authority, the First Circuit found that the asserted right was in any case not clearly established so that the troopers were entitled to qualified immunity. *Id.* at 116-17.

Turning to the present matter, Plaintiff does not dispute that there was probable cause to arrest the wanted Timothy Diaz, that there was a valid warrant for his arrest from Prince George's County, and that the NCIC Report indicated that Prince George's County would extradite "Timothy Diaz" upon his arrest. Biribin Cert. Ex. D. Moreover, when the Officer Defendants first approached Plaintiff in the Ramada Inn, Defendants' mistake of identity was reasonable. Plaintiff and the wanted Timothy Diaz were both males, had the same first and last names, had the

same middle initial, and were approximately the same height and age. *Compare* Biribin Cert. Ex. D, *with* Ex. C. In addition, when asked, Plaintiff confirmed that he was Timothy J. Diaz and had been in Maryland and was issued a ticket while in the state. Diaz Dep. T11:3-8; T11:14-24. Thus, there were enough initial similarities to make the mistaken identity reasonable when Plaintiff was first placed in custody at the Ramada Inn. *See, e.g.*, *Cannon v. City of Wilmington Police Dep't*, No. 11-136, 2012 WL 4482767, at *4 n.2 (D. Del. Sept. 27, 2012) (concluding that mistaken identity was not unreasonable where innocent plaintiff had same first, last and middle initial as subject in arrest warrant and birth years differed by one digit); *Creveling v. Columbia County*, No. 07-661, 2008 WL 1826907, at *4 (M.D. Pa. Apr. 22, 2008) (finding that officers possessed a reasonable belief to arrest the roommate of an individual with a valid arrest warrant "[b]ased on the similarity of the descriptions . . . , the fact that they both resided at the same address, and plaintiff's failure to identify himself or provide identification").

Moreover, given that the Fourth Amendment merely requires the specific name of the suspect to appear on an arrest warrant, and the name on the warrant was the same as Plaintiff's, the initial arrest at the Ramada Inn was constitutional. *Williams v. City of Northfield*, No. 09-6192, 2011 WL 6149733, at *10 (D.N.J. Dec. 9, 2011) ("An arrest warrant that correctly names the person to be arrested generally satisfies the fourth amendment's particularity requirement[.]"). Plaintiff does not make any strenuous argument that his arrest at the motel was improper. Instead, Plaintiff focuses on what occurred soon thereafter, specifically, when he was taken to the station and realized that law enforcement were looking for a different Timothy J. Diaz. It was at this point that Plaintiff made his innocence clear and offered his birth certificate and social security card as corroboration.

As noted, the threshold question facing the Court is whether Plaintiff has established that

his constitutional right or rights were violated when the Officer Defendants failed to investigate and confirm that Plaintiff was not the right person? The short answer is that, at best, it is not clear.[5] As a result, even if Plaintiff's rights were violated, such rights were not clearly established and the Officer Defendants are entitled to qualified immunity. To be clear, the Court is sympathetic to Plaintiff's plight. There is no dispute that Plaintiff was not the same Timothy Diaz listed in the Maryland warrant. Assuming Plaintiff's facts as true,[6] the Court certainly believes that the Officer Defendants should have taken some reasonable, and relatively easy steps, to confirm that they had the right person once back at the station. The Officer Defendants could have taken a picture of Plaintiff and sent it to Maryland for confirmation, or they could have asked Maryland authorities for a photograph of the wanted Timothy Diaz. Assuming Plaintiff's version of events, the Officer Defendants took no action despite Plaintiff's immediate indication (and offer of proof) that New Jersey had the wrong man.

The Court's inquiry is limited to, however, whether the Officer Defendants violated Plaintiff's constitutional rights. At the outset, the Officer Defendants were not the "prosecuting officers," so this matter is different than that of the investigating officer in *Kelly*. To the contrary, this case presents an analogous situation to the arresting officers in *Kelly*, who were dismissed

---

[5] The Court is not addressing the scenario in which the arresting officer was involved in, or has personal knowledge of, the underlying investigation. Nor is the Court addressing the situation in which law enforcement makes material omission or misstatements in securing an arrest warrant. As discussed in *Wilson*, such a situation is subject to a different analysis.

[6] As noted, Plaintiff claims that he offered his birth certificate and social security card to the Officer Defendants in an effort to prove that he was a different Timothy Diaz than the one listed in the warrant. The Court credits these assertions at the summary judgment stage, although the Court observes that the social security card was likely unhelpful to Plaintiff's claims of mistaken identity. The Maryland authorities had entered Plaintiff's social security number by mistake. Thus, instead of proving his innocence, Plaintiff's social security number may have had the opposite effect because it would have been a match. Also, of note, is regardless of Plaintiff's contentions, the Officer Defendants acknowledge that they were aware of the weight and date of birth discrepancies.

from the case. Nor is this a case in which the Officer Defendants had actual knowledge that Plaintiff was the wrong person; instead, Plaintiff claims that the Officer Defendants failed to reasonably follow-up on his claim of mistaken identity. If they had, Plaintiff continues, then the Officer Defendants would have learned from law enforcement in Maryland that Plaintiff was not the correct Timothy Diaz.

The United States Supreme Court, in *Baker*, did not find that Plaintiff has the constitutional right which he is claiming. Instead, the *Baker* Court merely assumed, *arguendo*, that such a right existed following "the lapse of a certain amount of time[.]" *Baker*, 443 U.S. at 145. Moreover, there is no precedential opinion from the Third Circuit finding such a right. Instead, the court in *Wilson* expressly ruled that it was not deciding "these difficult issues." *Wilson*, 212 F.3d at 792. Finally, there is no consensus of persuasive authority from other jurisdictions that clearly establish the right asserted by Plaintiff. The Third Circuit in *Wilson* recognized the opposite: circuits had reached contrary conclusions in determining the issue. *Id.* The Court finds the analysis by the First Circuit in *Brady* to be persuasive. The *Brady* court appeared to fairly balance the various roles and considerations of those involved in the criminal justice system when it determined that, as a general rule, if police become aware of exculpatory information, they should bring it to the attention of the prosecutor or judge. Yet, even in that case, the court did not indicate that police had a duty to investigate pleas of innocence. More importantly, the First Circuit's decision does not represent a consensus of persuasive authority. In fact, it does not appear that the circuits are in agreement as to whether such a duty vis-à-vis exculpatory information arises, if at all, pursuant to the Fourth Amendment (*BeVier*)[7] or the Due Process Clause (*Brady*).

---

[7] *See also Clipper v. Takoma Park*, 876 F.2d 17, 20 (4th Cir. 1989) (conducting an Fourth Amendment analysis).

In the Court's view, in light of the dicta in *Baker*, the Due Process Clause of the Fourteenth Amendment is the appropriate avenue for redress in situations akin to the present scenario, that is when a person is initially and lawfully arrested pursuant to a valid warrant while at the same time (or thereafter) claiming that he or she is not the person who is wanted. *Baker*, 443 U.S. at 145. Moreover, the Court views the appropriate constitutional standard as requiring an officer to make a reasonable inquiry to confirm that he or she has arrested the correct person when the suspect claims that it is a matter of mistaken identity. The reasonableness of the inquiry will depend upon the circumstances (including the technology available to the officers), but the Officer Defendants could have satisfied it here by contacting Maryland authorities for confirmation. Depending upon the results of the reasonable inquiry, an officer's duty may or may not end. If the officer does not receive a response to a reasonable inquiry or if the officer does not receive exculpatory information in response, the officer's duty ends. If the officer receives exculpatory information of any type, then the officer must provide it to the prosecutor or judge in due course. However, if the officer receives exculpatory information whose validity cannot reasonably be questioned, then the officer had a duty to disclose it to either a prosecutor or the appropriate judicial officer as soon thereafter as is reasonably possible.[8] Such type of exculpatory information would include photographs,

---

[8] The Court generally agrees with the First Circuit in *Brady* that such decisions, to release a person after a valid arrest due to exculpatory evidence, should be made by a prosecutor or judge. The Court would not view it as the duty of the arresting officers (who were not involved in the underlying case). However, the Court does not believe that if the arresting officers are convinced that they have the wrong person, the officers are without discretion to immediately release the person. For example, in this case, if the Officer Defendants had taken a picture of Plaintiff and electronically sent it to the Maryland authorities (such as by way of an attachment to an email or text message), and the Maryland authorities had responded that Plaintiff was not the same Timothy J. Diaz they were seeking, the Officer Defendants would have been free to release Plaintiff without first seeking approval from a prosecutor or judge. However, in this Court's view, the Officer Defendants would only have had to convey such information to a prosecutor or judge and first received approval before releasing Plaintiff.

fingerprints, or surveillance footage showing that the person in custody is not the person named in the warrant. The *Kelly* court referred to such exculpatory information as "fundamental" evidence. Such information is to be contrasted to evidence which is open to interpretation and evaluation, such as an alibi provided by a close friend or family member of the person arrested.[9]

There are two important caveats to the foregoing analysis. First, the Constitution does not require the officers to take such action, if at all, until there has been "the lapse of a certain amount of time" as stated by the Supreme Court in *Baker*. Second, if Plaintiff here was in fact brought before a judge the day after his arrest (again the record is not clear on this point) and Plaintiff had the opportunity to convey his mistaken identity arguments to the court, then the Officer Defendants would not have had to take any further action.

In sum, as the law currently stands pursuant to Supreme Court precedent, Third Circuit law, and the case law of other jurisdictions, it is not clear whether any constitutional right of Plaintiff was in fact violated, accepting all of Plaintiff's facts in a light most favorable to him. As a result, and at a minimum, the Officer Defendants are entitled to qualified immunity because the constitutional right is not clearly established. This finding, however, does not absolve the Officer Defendants from potential tort liability, as recognized by the Supreme Court in *Baker*. But because the Officer Defendants are entitled to qualified immunity, the Officer Defendants' motion for summary judgment is granted on Plaintiff's Section 1983 claim as to the Officer Defendants.

---

[9] Again, police must still provide such information to the prosecutor, but a prosecutor may very well (and reasonably) review such information and determine that it is not credible.

b.     **The South Plainfield Defendants' Motion for Summary Judgment**[10]

The South Plainfield Defendants argue that the Court should grant them summary judgment on the Section 1983 claim because Plaintiff provides no evidence establishing a policy or custom that led to a deprivation of his Constitutional rights.[11]  A municipality cannot be liable under Section 1983 for the acts of its employees on the basis of *respondeat superior*.  *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690-91 (1978)).  Rather, to hold a municipality liable, a plaintiff must demonstrate that the violation of rights was caused by a municipal policy, practice, or custom.  *Id.*  To that end, a plaintiff must identify a policy or custom that "violates the Constitution or . . . while not unconstitutional itself, is the moving force behind the constitutional tort of one of its employees."  *Id.* (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1027 (3d Cir. 1991)).  The South Plainfield Defendants maintain that summary judgment must be granted because Plaintiff fails to point to any policy or custom that led to the Constitutional violation at issue.  S. Plainfield Br. at 8.  The South Plainfield Defendants are correct in that Plaintiff fails to point to any formal policy or custom.

Plaintiff, however, alleges that the violation was caused by the South Plainfield Defendants' failure to train officers as to the execution of fugitive warrants.  S. Plainfield Opp. Br.

---

[10] As noted in the discussion concerning the Officer Defendants, it is not clear that Plaintiff has established a violation of his constitutional rights.  Without showing such a violation, there is no liability for either the South Plainfield Defendants or the Middlesex County Defendants.  The Court nevertheless analyzes the Section 1983 claims as to the remaining Defendants because, as is discussed, the claims fail for additional reasons.

[11] While not raised by the South Plainfield Defendants, the Court notes that a city police department is not a proper party for a Section 1983.  *See Godley v. Newark Police Dep't*, No. 05-806, 2007 WL 269815, at *3 (D.N.J. Jan. 26, 2007) (dismissing Section 1983 claim against the Newark Police Department because it was not an entity that was subject to suit).  Instead, the municipal entity is the appropriate defendant.

at 3. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of [Section] 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). When asserting a *Monell* claim based on a failure to train, "liability . . . requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Thomas*, 749 F.3d at 222. Deliberate indifference "require[es] proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Bd. of Cty. Commr's of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). Deliberate indifference is normally established through facts demonstrating a "pattern of similar constitutional violations by untrained employees" because "[a] pattern of violations puts municipal decisionmakers on notice that a new program is necessary." *Id.*

In support of his argument, Plaintiff points to South Plainfield's policy regarding fugitives, which states that individuals *may* be taken into custody when there is a written warrant confirmation from an out-of-state authority that will extradite the individual. Biribin Cert. Ex. F. Despite the existence of this policy, Officer Bullock testified that he was required to arrest Plaintiff. Bullock Dep. T57:8-16. This fact alone, however, is insufficient to create a genuine issue of material fact as to the existence of South Plaintiff's deliberate indifference.[12] First, Plaintiff provides no evidence establishing whether South Plainfield trained officers as to fugitive arrests, what the training entailed, or what was deficient in the training. *See, e.g., Noble v. City of Camden*,

---

[12] Plaintiff does not appear to argue that the fugitive policy itself is unconstitutional and also cannot rely on Officer Bullock's purported failure to adhere to this policy to establish liability for South Plainfield. An officer's failure to adhere to a facially constitutional policy is an issue for individual liability as to the officer, not liability as to the municipality. *See Thomas*, 749 F.3d at 222. To be clear, Plaintiff does not argue that Officer Bullock did not adhere to the policy; the policy permitted Officer Bullock to make the arrest. Instead, Plaintiff asserts that Officer Bullock misunderstand the permissive nature of the policy, believing it to be mandatory.

112 F. Supp. 3d 208, 225 (D.N.J. 2015) (granting summary judgment to Camden where plaintiff failed to provide any evidence regarding what training was provided, the substance of the training, or the frequency of the training). Second, Plaintiff fails to point to any facts demonstrating that similar constitutional violations regularly occur, such that South Plainfield should have been on notice of the need for training. *See, e.g.*, *Brooks v. Codispoti*, No. 12-5884, 2015 WL 9462086, at *12 (D.N.J. Dec. 28, 2015) (granting summary judgment to municipality because "[p]laintiff does not offer evidence on the current training or lack of training on excessive force, nor does Plaintiff allege a pattern of constitutional violations sufficient to put the city on notice that the training is inadequate"). Consequently, Plaintiff fails to provide evidence creating a material issue of fact as to South Plainfield's allegedly insufficient training. Summary judgment, therefore, is granted to the South Plainfield Defendants for the Section 1983 claim.

c.      **The Middlesex County Defendants' Motion for Summary Judgment**

The Middlesex Defendants[13] also argue that the Section 1983 claim should be dismissed as to them because Plaintiff fails to set forth facts demonstrating that a policy or custom led to a constitutional violation. Middlesex Br. at 15-16. Plaintiff argues that there are also material issues of fact as to whether the Middlesex Defendants were properly trained in the execution of fugitive warrants and the identification of fugitives. Middlesex Op. Br. at 7. But like the South Plainfield Defendants, Plaintiff fails to provide any evidence regarding the Middlesex Defendants' training or lack thereof of, or facts regarding similar constitutional violations such that the Middlesex Defendants should have been on notice of the need for training. *See, e.g.*, *Brooks*, 2015 WL

---

[13] While not raised by the Middlesex Defendants, the Court notes that the Middlesex County Department of Corrections is not a state actor for Section 1983 purposes. *See Majette v. Turner*, No. 15-5960, 2017 WL 3055509, at *3 n.3 (D.N.J. July 18, 2017). Instead, the municipality is the appropriate defendant.

9462086, at *12. Consequently, for the same reasons that the Section 1983 claim fails as to South Plainfield, summary judgment is granted to the Middlesex County Defendants for the Section 1983 claim.

## 2. PLAINTIFF'S TORT CLAIMS

Plaintiff originally filed this case in New Jersey state court asserting tort claims and a Section 1983 claim against all Defendants. Defendants subsequently removed this matter on the basis of the federal question jurisdiction that arose from Plaintiff's Section 1983 claim. *See* Notice of Removal. Now, as a result this Court's decision to grant summary judgment for the Section 1983 claims asserted against all the Defendant, only Plaintiff's state tort law claims remain.

"Federal courts are not courts of general jurisdiction." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541-42 (1986). In order to adjudicate a case, a federal court must have subject matter jurisdiction. *Id.* While neither party raised the issue of remand here, a federal court is obliged to notice any jurisdictional defects. *Kaplan v. Garrison*, No. 15-1915, 2015 WL 2159827, at *2 (D.N.J. May 6, 2015). As discussed, Defendants removed this matter on the basis of federal question jurisdiction (due to the Section 1983 allegations), pursuant to 28 U.S.C. § 1331, and the Court had supplemental jurisdiction over Plaintiff's other state tort claims. 28 U.S.C. § 1367. Because the Court has granted Defendants summary judgment on the federal claims, the Court lacks subject matter jurisdiction over Plaintiff's remaining tort law claims.

28 U.S.C. § 1367(c) gives district courts discretion to decline to hear state law claims they would otherwise have supplemental jurisdiction over through Section 1367(a). Specifically, Section 1367(c)(3) provides that a "district court[] may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." Thus, retaining supplemental jurisdiction is a matter of discretion. *Borough of West*

*Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995). However, the Third Circuit has determined that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Id.* (emphasis added). Additionally, while the determination is discretionary, "[t]he general approach is for a district court to . . . hold that supplemental jurisdiction should not be exercised where there is no longer any basis for original jurisdiction." *Shaffer v. Township of Franklin*, No. 09-347, 2010 WL 715349, at *1 (D.N.J. Mar. 1, 2010); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (encouraging federal courts to avoid "[n]eedless decisions of state law"); *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 106 (3d Cir. 1990) ("[T]he rule within this Circuit is that once all claims with an independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court."). If a district court decides it will not hear the remaining state law claims, and the case has been removed from a state court, the Court must remand the matter back to state court. *Bromwell v. Mich. Mut. Ins. Co.*, 115 F.3d 208, 213 (3d Cir. 1997) (concluding that "the plain language of 28 U.S.C. § 1447(c) mandates that the matter be remanded to the state court from which it was removed").

Under the present circumstances, the Court finds that remand is appropriate because no federal cause of action remains. While remand will certainly delay decision on the remaining summary judgment issues, the parties' central facts and substantive arguments should remain the same. In addition, remand serves the goals of judicial economy and comity by allowing the New Jersey courts to apply New Jersey law. Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims pursuant to Section 1367(c)(3) and will remand the action to the Superior Court of New Jersey, Middlesex County. *See Schaffer,* 2010

WL 715349, at *1 (declining to exercise supplemental jurisdiction over plaintiffs' remaining state law claims after plaintiffs voluntarily dismissed sole federal claim against defendant with prejudice).

## IV. CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment (D.E. 88, 89, 91) as to Plaintiff's Section 1983 claim are **GRANTED**. Because the Court lacks subject matter jurisdiction over the remaining tort claims as a result of this decision, the Court administratively terminates the remainder of Defendants' motions and remands this action to the Superior Court of New Jersey, Middlesex County. An appropriate Order accompanies this Opinion.

Dated:        August 3, 2017

John Michael Vazquez, U.S.D.J.